| 67 | 131 |
|----|-----|
| 132 | 410 |
| 67 | 131 |
| 143 | 630 |

RHODES ET AL. *v.* MATTHEWS ET AL.

CONTRACT FOR BENEFIT OF ANOTHER.—*Statute of Frauds.—Grammatical Construction.—Special Finding by Jury.*—In an action on account, by employees of a certain manufacturing company. against a creditor of such company, for labor alleged to have been performed by the plaintiffs for such creditor, the jury, with their general verdict for the plaintiffs, found specially, in substance, as follows : That, at a time when the plaintiffs were employed by such company in manufacturing, the defendant, on being notified by such company, that manufacturing must cease unless he would furnish means to continue the same. agreed with said president, upon a sufficient consideration, to furnish the means to operate the factory and carry on its business, including the payment of the operatives engaged in the factory ; that means were furnished by him for that purpose, and that he received the proceeds of the business ; that the operatives were informed of this contract, and acted upon it in rendering their ser-

vices ; and that the defendant was informed of, and did not object to, the fact that such operatives were acting upon the faith of such contract, in rendering such services.

*Held,* that, on the facts found, the defendant is liable.

*Held,* also, that such contract was one for the benefit of the plaintiff, and was not within the statute of frauds.

*Held,* also, that the defendant can not object to the use of the verb " operate," used in the instructions to the jury, in an active sense.

From the Marion Superior Court.

*J. T. Dye, A. C. Harris, J. M. Judah* and *A. S. Caldwell,* for appellants.

*P. Rappaport,* for appellees.

BIDDLE, J.—The appellee commenced proceedings in attachment, before a justice of the peace, against the appellants, upon a complaint in the form of a common count, with a bill of particulars filed, for work and labor done and performed.

Numerous other creditors of the appellants came in under the attachment, and filed similar complaints, with bills of particulars, for work and labor done and performed for the appellants.

Judgments were recovered upon the claims, before the justice, from which the appellants appealed to the Superior Court, wherein, at special term, upon trial by jury, a general verdict was returned in favor of the attachment creditors, with a special finding.

The appellants moved for judgment in their favor on the special finding, notwithstanding the general verdict. Motion overruled. Motion for a new trial also overruled. Exceptions to both rulings. Judgment on the verdict. Appeal to the general term, wherein the judgment was affirmed. Appeal to this court.

Did the court err in overruling the appellants' motion for judgment in their favor on the special finding ?

This question is elaborately argued by the counsel for appellants, and we think it is the controlling question of the case.

The evidence tends to show that the labor, the value of which is sued for, was performed by the appellees, as operatives, in running, managing and conducting the "Capital City Rolling Mill Company," of Indianapolis; and the question does not seem to be so much as to whether the labor was performed, or as to its value, as it is whether the appellants were liable to pay for it or not. This, we believe, is the contest in the case. Upon the evidence the jury returned the following general verdict and special finding :

"We, the jury, find for the plaintiffs, as against Rhodes & Bradley, and assess the damages in favor of each plaintiff as follows :" The amounts need not be stated.

Upon interrogatories moved by the appellees, the jury returned the following special finding :

" 1. Were not Rhodes & Bradley operating the Capital City Rolling Mills during the time the services were rendered for which these suits were brought ?

" Answer. Yes.

" 2. Did not Butsch, the president of the Capital City Rolling Mill Co., on or about November 30th, 1877, notify Mr. Sargent, agent for Rhodes & Bradley, that the Capital City Rolling Mill Co. could not run the mill any longer, but that unless Rhodes & Bradley would furnish the material, and pay the operating expenses of the mill, the mill must stop?

" Answer. Yes.

" 3. Did not Rhodes & Bradley, after such notification, furnish all the material and pay all the operating expenses of the mill, including the pay-roll of laborers, up to the time the services were rendered for which these suits were brought?

" Answer. Yes.

" 4. Did not the men know that Rhodes & Bradley

were furnishing the money to pay the pay-rolls, and to operate the mill?

"Answer. Yes.

"5. Did not Rhodes & Bradley understand that they were to pay the men for the services rendered, for which the suits were brought in these cases?

"Answer. Yes.

"6. Did not Rhodes & Bradley, as early as December 7th, 1877, know that Butsch was informing customers of the mill that the mill was being operated by Rhodes & Bradley, and that all orders must come through them?

"Answer. Yes."

The answer to the 8th interrogatory merely states the amount due to each claimant, under the attachment, the same as it is stated in the general verdict.

In answer to interrogatories moved by the appellants, the jury returned the following special finding:

"1. Was not Valentine Butsch president of the Capital City Rolling Mill Company, from and before September 1st, 1877, to the bringing of these suits, on the 16th day of February, 1878?

"Answer. Yes.

"2. Was not said Capital City Rolling Mill Company a corporation engaged in the business of rolling iron in the city of Indianapolis, in its rolling mill, on and before November 5th, 1877?

"Answer. Yes.

"3. Was not the plaintiff Ebenezer Matthews employed by said corporation, through its president, Butsch, to work in the rolling mill of said corporation long prior to November 1st, 1877?

"Answer. Yes.

"4. Did not plaintiff Matthews ever make any contract with defendants? If so, when, where, and through

whom was it made, and was such contract written or verbal?

"Answer. No.

" 5. Was not the work, for which said Matthews sues in his complaint in this case, performed by him under said contract with. Butsch, as president of said corporation? If not, when, where, and with whom did Matthews make the contract under which he performed said work?

"Answer. Yes. But defendants, Rhodes & Bradley, became the operators of the mill about the 10th day of December, 1877, and as such became liable to him for the pay for his services.

" 6. Did the defendants, Rhodes & Bradley, ever make any contract with any of the plaintiffs in these suits? If so, was such contract written or verbal, what was its date, and where and with whom was it made?

"Answer. No.

" 7. Did not the defendants, Rhodes & Bradley, have a claim of from $1,200 to $1,600 against said Capital City Rolling Mill, on the 5th day of, November, 1877?

"Answer. Yes.

" 8. Did not said defendants enter into a contract with said Capital City Rolling Mill Company, through V. Butsch, its president, about the 5th of November, 1877, at Chicago, by which they agreed to furnish old iron to said company, for Rhodes & Bradley, the old iron to. be rated at $22 a ton, and Rhodes & Bradley to retain upon the sale of the iron $4 per ton additional, to be credited on said indebtedness to them, the residue over $26 per ton to go to said.Capital City Rolling Mill Company, as compensation for rolling said iron? If not, what was the contract between the defendants and said company?

"Answer. Yes.

" 9. Was any subsequent contract ever made or entered

into by and between said defendants and said corporation? If so, was it written or verbal? If written, what was its date, and by whom was it signed? If verbal, when and where, and by whom was it made?

"Answer. Yes. By compliance with the correspondence of V. Butsch, about November 30th, 1877, to furnish means to operate the mill.

"10. Did not the defendants, in November, 1877, begin to furnish iron to be rolled by said company under said contract?

"Answer. Yes.

"11. Did they not continue to furnish iron to said company, to be rolled, till a short time before the bringing of this suit in February, 1878?

"Answer. Yes.

"12. Was there ever any settlement between said defendants and said company of the business done under said contract? If so, when?

"Answer. No.

"13. Were not the accounts of said business kept by said company in its books, from the time said business begun under said contract, till said mill ceased to roll iron for said defendants?

"Answer. Yes. Up to about the 11th day of December, 1877; after that, by the defendants' book-keeper, Geo. Daniels.

"14. Was there any week [?] or difference made in the manner of keeping said accounts from the time the work began under said contract, till the mill ceased to roll iron for the defendants, in February, 1878? If so, when?

"Answer. None.

"15. From the time the work began till it ended, were not the said Rhodes & Bradley credited by said company with all sums advanced by them to make payments upon pay-rolls, or to pay other expenses incurred by said com-

pany, about the rolling of said iron, and charged with all sums received by them from proceeds of sales of iron rolled, upon the books of said corporation.

" Answer. Yes; as memorandum accounts.

" 16. Did Rhodes & Bradley ever agree in writing, to and with the said Rolling Mill Company, or said Valentine Butsch, or any of said plaintiffs, to assume or pay the claims of plaintiffs sued on in this suit, before said work had been done ? If so, what was the date of said writing, and by whom was it signed ?

" Answer. No; only by correspondence with V. Butsch.

" 17. Did Rhodes & Bradley ever agree verbally, before said work had been done, to or with said corporation, or said Butsch, to assume or pay the same ? If so, give the precise date of such agreement, and the persons by whom it was made ?

" Answer. No ; only by compliance with V. Butsch's communication about the 30th of November, 1877, they furnished all the means to operate the mill.

" 18. If you say any such arrangement was ever made to assume or pay plaintiffs' claims, state fully whether there was any consideration for said arrangement, and fully what that consideration was.

" Answer. No; only by furnishing the means to run the mill and paying all the expenses of the same, and receiving the proceeds thereof.

" 19. If you answer that Rhodes & Bradley ever assumed to pay any debts of said corporation, state fully and particularly the amount of the debts thus assumed, and the person to whom each amount was due.

" Answer. No."

The proposition insisted upon by the counsel on behalf of the appellants is, that the special finding shows that no contract was ever made between the appellants and the appellees, either verbal or written;

and that the special finding also shows a state of facts out of which no implied contract arises; and therefore that the special finding is inconsistent with the general verdict, and should control the latter; and that the court should have given judgment accordingly in favor of the appellants.

It is certain that the special finding does show that no express contract, either verbal or written, was ever entered into between the appellants and the appellees, for the performance of the services on which the suits are founded; but we think the interrogatories and answers of the special finding, when taken and construed together, as is required to be done, find the following facts:   That the appellants agreed with Butsch, the president of the Capitol City Rolling Mill Company, upon a sufficient consideration, to furnish the means to operate the rolling mill, and carry on its business, including the payment of the operatives engaged in the mill; that means were so furnished for that purpose by the appellants, and that they received the proceeds of the mill; that the operatives were informed of this contract between the president of the rolling mill and the appellants, and acted upon it in rendering their services to the mill; that the appellants knew that the operatives acted upon the faith of said contract in rendering their services, and made no objections thereto; and that the services were rendered as claimed, to the amount found.

Out of these facts we think an implied contract would arise in favor of the appellees, upon rendering the services, and against the appellants, to pay for the services when rendered.   It was not necessary that there should have been an express contract, either verbal or written, between the appellants and the appellees; when the services were rendered and accepted, the law instantly made the contract for them.

We can not see any necessary conflict between the gen-

eral verdict and the special finding, upon their faces; and when we look into the evidence, which is all before us, it appears to us that they are in full harmony. See Buskirk Prac. 216, and the authorities therein cited; also the following cases: *Adams* v. *Cosby*, 48 Ind. 153; *The Indianapolis & St. Louis R. R. Co.* v. *Stout*, 53 Ind. 143; *Graham* v. *Graham*, 55 Ind. 23; *Murray* v. *Phillips*, 59 Ind. 56; *The Detroit, Eel River and Ill. R. R. Co.* v. *Barton,* 61 Ind. 293; *The Indianapolis and Vincennes R. R. Co.* v. *McCaffrey*, 62 Ind. 552; *Ohm* v. *Yung*, 63 Ind. 432.

Again: The contract between the appellants and Butsch, the president of the Rolling Mill Company, by which the appellants agreed to furnish means to pay the operatives of the mill for their labor, was a contract for the benefit of the latter, and each one may enforce his action upon it in his own name, even though he had no knowledge of such contract at the time he rendered the services. It is settled law in this State that a contract made by one with another for the benefit of a third person may be enforced by the latter. See the case of *Miller* v. *Billingsly*, 41 Ind. 489, and the authorities therein cited.

The case is not embarrassed by the statute of frauds, as the appellants seem to think. Their contract with Butsch was not to pay the debt of another, but to pay their own debt to another. The general verdict implies, and the special finding shows, that the debt did not exist at the time the contract was made; it was therefore not a contract to pay the existing debt of another, and was not required to be in writing.

The learned counsel critically object to the use of the verb "operate" in an active sense, as meaning running the mill or carrying on its business. They think that the use of the word in that sense by the court in its instructions to the jury, and also in the special finding, has injured their case by confusing and misleading the jury. They say: "The

truth is that the verb *operate* is a neuter verb. The mill operates, but the miller does not operate the mill." It may be that the etymology of the word makes it a neuter verb; but modern usage has accepted it as an active verb. In this it is in consonance with the noun *operative*, as meaning a manufacturer, or artisan, who performs the manual labor necessary to cause a mill or factory to operate. The word "operate" is frequently used by the Legislature in the statutes of this State in its active sense, when applicable to the business of railroads, as meaning running or managing a railroad. The law uses words in their accepted sense, rather than according to their strict etymology, or to the niceties of philology  We do not think the court erred in the use of the word "operate ;" at least we have ventured to use it in the same sense in this opinion.

It does not appear to us necessary to set out the instructions given and refused, or to particularly notice some other points saved in the record, and debated in the briefs of counsel. The case was evidently tried below upon the ground we have placed it here ; and, if we are right in this, it can scarcely be claimed that the court erred in the questions not particularly noticed, for they are all in harmony with the main question as here decided. We must be excused from this labor on account of the great length to which this opinion has already been extended.

The judgment is affirmed, at the costs of the appellants.